## Philadelphia Ward Realignment

*Harry Wolov,* for Ward Realignment Commission.

*Herbert S. Levin,* for Democratic City Committee.

*Stanley M. Greenberg,* for Republican City Committee.

*William B. Mullin, Mercer D. Tate, Gregory M. Harvey, Francis E. Gleeson, Jr., and Wilhelm F. Knauer,* for objectors.

ALEXANDER, J., August 2, 1965.—This court has before it the report and plan of the Ward Realignment

Commission which was filed within the 90-day period by order of this court bearing date of April 30, 1965, said filing date being July 12, 1965.

On July 14, 1965, a preliminary order was entered accepting and approving the report, plan and description subject to a final order following notice of a public hearing to be held on Monday, July 26, 1965, in Room 653 City Hall, Philadelphia, Pa., at 10 a.m. (E.D.T.).

This court ordered that notice of the above hearing, and its time and place, shall appear in proper form in The Legal Intelligencer, the Philadelphia Bulletin, the Philadelphia Inquirer and the Philadelphia Daily News not later than July 16, 1965. Affidavits and copies of the legal notice giving the time, date and place of the public hearing, which notice was published on July 15, 1965, are attached hereto and made a part of this opinion.

On the date of Monday, July 26, 1965, in Room 653 City Hall, a full and lengthy hearing on the report of the Ward Realignment Commission was held, at which a large number of persons appeared, many of them members of the Philadelphia bar, officers of the city and State governments and persons in private life, some of whom gave testimony in support of their objections to the report of the commission. Upon hearing the objections to the report of the commission by witnesses who were called and by the arguments of their counsel, the commissioners were given an opportunity to present their own arguments in support of their report. In addition, the court called upon the chief deputy city solicitor for the views of the City of Philadelphia and any others who were present in support of the report of the commission.

This court is of the opinion that every opportunity was given to the citizens of Philadelphia in every walk of life to express themselves on the question of the

practicality, the feasibility and the effective operation of the ward realignment plan as filed by this commission. This they did. This was an open, public hearing which, with only a short interruption, lasted from 10:15 a.m. (E.D.T.) until close to 3 p.m. (E.D.T.). Every witness was heard fully, and all counsel who appeared were given full opportunity to express their views as was the chairman and vice chairman of the commission.

It must be realized that any plan that any commission appointed for such a purpose which attempts to divide, ward-wise, as near as possible equal numbers of voters and election division, is faced with a herculean and almost impossible, as well as a thankless task. There will always be those who will honestly and sincerely believe they have been treated unjustly, as well as the perennial and/or rebellious malcontents. Happily, none of the latter class appeared to delay or disrupt the hearing, and for this both the court and, I am certain, the commission are thankful. Objectors and proponents alike must view the undertaking in the light of a realistic and practicable solution being resolved, recognizing the variables inherent in such an assignment. For example, there will and, unquestionably in this case, did appear what would seem to be a disproportionate number of electors in a very few wards in some parts of the city as compared with others in other areas. This is not unexpected. The commission in its study gave consideration to *growth factors* in areas of large ward-size with a present small population and, similarly, considered the possibility of *nongrowth* or *static* population in wards of relative population density where further growth was quite unlikely. At the same time, the commission gave great consideration to diminished population in areas where redevelopment plans were underway, causing a further *loss* of population.

Attention must also be called to the fact that the commission had to use the *population figures* of the *1960* census, now five years out of date. There are no others available. It was necessary to project growth, static and diminished figures on the best evidence, dehors census records, available.

The court makes the above general observations in consideration of the many objections filed, testified to and argued so fully at the public hearing on July 26, 1965. The court would be remiss if it did not express its sincere compliments to counsel who presented their views to the court with such skilled and persuasive advocacy. The presentations and briefs of Mercer D. Tate, Esq., Gregory M. Harvey, Esq., Francis E. Gleeson, Jr., Esq., and the argument of counsel for the Committee of Seventy indicated not only that they fully grasped the intricate and complex problems faced by the commission, but that they were sensitive to and committed to the problems and interests of the citizenry, the electors in their respective areas, whatever may be their economic, educational, social, racial or religious status. For this, this court expresses its sincerest compliments.

This court will refer only briefly to some of the main arguments of those who opposed the realignment plan as submitted by the commission.

With respect to the attack on the constitutionality of the new statute authorizing this proceeding, the court considers this to be without merit. Notice of the public hearing on July 26, 1965, widely published in the general news columns of the daily papers and over the radio and television for several days prior to the hearing, in addition to the published notices in the various legal and generally circulated papers, satisfied the objections. In addition, numerous public hearings of the commission in the early stages of these hearings are generally agreed as having taken place.

The report shows that several weeks after the commission was originally created (February 5, 1962), the first public hearing was held. There were four public hearings open to all persons. The average number of persons attending was between 10 to 15 persons. General apathy seemed to be the rule in attendance of the public. Of the very few who attended, almost all were either ward leaders, committeemen or holders of political offices.

As far as the court has been able to ascertain, a citizen has no constitutional right to live in one particular ward as against another ward.

Regarding the objection that the plan proposes too many wards and, therefore, gives greater strength to "the power at the top" of a political hierarchy, there is considerable weight to such an argument, if you assume there exists a dictatorial "head" or "leader" of the particular party in question, and incompetent and voiceless committee members beholden to him. There appears to be no such feudal dynasty in either of the political parties in this city; nor, happily, is the threat of such anywhere indicated. It may well be argued that the larger the representation of ward leaders who elect the city chairmen, the greater the integration of various ethnic, nationality and religious groups and the less chance of control of these heterogeneous amalgams by a single individual.

With respect to the commission's use of improper criteria, the court feels this must be left to the discretion of the commission and the court. The failure of the statute to set forth explicit criteria would seem to indicate that this must be left to the sound discretion of both the commission and the court.

The full report of the commission is in great detail and is very comprehensive. It is physically impossible to detail the total expenses of the implementation of the final realignment plan. The commission has done

a remarkably fine job in this difficult undertaking. This is the first overall, city-wide realignment of the wards in the City of Philadelphia for 60 years. Ward realignment in major cities, except Philadelphia, usually has been made every 10 to 15 years. If the costs in this instance should appear to be high when finally computed, this court feels certain that when compared with other cities, and when it is realized that this is the first effort at ward realignment for a period of 60 years, the ultimate cost will prove to be very modest indeed. It must also be remembered that this court will have the responsibility of approving all costs incurred in this matter, and may be appealed to whenever anyone feels that any item of cost is unreasonable or unfair.

With respect to the fact that the commission members are "not impartial", the court feels this charge is vague, indefinite and lacking in specificity and factual support. The commission members were as evenly divided as possible (three Democrats and two Republicans). They were very knowledgeable, and equally so. The two leading party representatives, Messrs. Levin and Greenberg, were each counsel for their particular political party, and were so well considered by the Philadelphia Bar Association to have been recommended by the Judiciary Committee for appointment to the common pleas court, and were, a few days after the final hearing in this case, appointed as judges of our new Common Pleas Courts No. 9 and No. 10. Theodore S. Gutowicz, a member of the commission, was also approved as a member of our county court, and in all likelihood will be appointed by our distinguished Governor in the near future.

With regard to the complaint that the new ward plan "disregards the valid community of interest of electors" in a particular ward, this court must call attention to similar complaints filed when the twenty-second (Germantown) ward and the old forty-sixth

ward and, indeed, other long-established wards were divided. There is no inherent right that an elector has, by law, in the interest of or in a particular community or ward. A committee of officials appointed to plan anew ward lines must use their best and most honest judgment and appear as blindfolded dispensers of justice and disregard social, economic, racial and even cultural "community lines—or interests" for the betterment of the whole region. A ward line is a political line and not a cultural or social line. Furthermore, it appears that with respect to the proposed south end of the new eighth ward boundary line at Lombard Street, the record shows that the original plan was that the new eighth ward was to go to Pine Street and the *new* plan in this report was a compromise from the earlier plan and extends the eighth ward to Lombard Street. The commission feels that to extend the southern boundary of the eighth ward to South Street would remove some 2,700 electors from the thirtieth ward. With this serious depletion of electors from the thirtieth ward and the eventual intrusion of the Cross-Town Expressway between South and Bainbridge Streets slicing away another 6,000 electors, the thirtieth ward would become too small for legislative, senatorial or congressional reapportionment purposes.

The objections of our distinguished mayor, the able councilwoman Virginia Knauer and her husband, Senator William V. Mullin, Francis E. Gleeson, Jr., Esq., Joseph Scanlon and Benjamin Markowitz have all been studied with great care by this court. With respect to these matters, the court must refer the objectors to the comments of the court in the earlier paragraphs of this opinion; viz., changes and inconveniences in the places and areas of voting; in the availability of skilled party workers; in the ease of access to and location of ward headquarters or "charitable clubs" that have traditional loyalty ties to ward leaders or alert and promis-

764

ing younger political workers, and the chagrin and disappointment of men and women who have labored "long and faithfully in the political vineyard when things were tough and rough and the fruits of victory were sparse", must be expected in the never ending search for progress and for what is best for the whole city and for *all* the people in a great mobile population area such as our beloved Philadelphia. Those who are affected by these inconveniences must accept the inevitable with the realization that Philadelphia has not come to the end of its history; nor has the mayor of our great city, who in meeting the challenges and the problems of a great city, is daily making history.

The report of the Realignment Commission is hereby approved.